### TOWN OF BABYLON v. DARLING.

(Supreme Court, Trial Term, Suffolk County. June 4, 1909.)

1. DEEDS (§ 43*)—PATENTS—DESCRIPTION OF LAND—CORRECTION.

    Though a title, when once conveyed, cannot be lessened by a subsequent conveyance, yet, where the property conveyed by a patent was described in such a vague manner that one of its boundaries could not be ascertained, a subsequent patent, accepted and acted on by the parties, making such boundary certain, was effective to determine the property transferred.

    [Ed. Note.—For other cases, see Deeds, Dec. Dig. § 43.*]

2. NAVIGABLE WATERS (§ 36*)—LANDS UNDER WATER—OWNERSHIP—EVIDENCE.

    Evidence *held* to require a finding that the eastern boundary of the town of Huntington and the property granted to it under its various patents was fixed and determined by the Fletcher patent of 1694 at the eastern side of Sampawam's Point, and that to the west thereof its title extended to the ocean, so that from the eastern side of the point to the ranges the title to the land under water in Great South Bay, the property in question, was in the state of New York.

    [Ed. Note.—For other cases, see Navigable Waters, Dec. Dig. § 36.*]

Action by the Town of Babylon against William Darling. Judgment for defendant.

Thomas Young and Asa A. Spear, for plaintiff.

Timothy M. Griffing and Joseph Wood, for defendant.

CRANE, J. By this action it is sought to determine whether Babylon township or the state of New York has title to the land under water of the Great South Bay between the Brookhaven line, known as "the Ranges," and Sampawam's Point, a distance of about 10 miles. If the state has title, judgment must be for the defendant. If Babylon is the owner, judgment must be awarded the plaintiff in the sum of six cents, under the stipulation of counsel.

It is conceded that the title of the plaintiff is dependent upon the rights and title of its predecessor, the town of Huntington. The plaintiff claims title under patent of 1666, known as the "Nicolls pat-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ent," confirmed by the Dongan patent of 1688, which conveyed to the town of Huntington the following premises:

"From a certaine river or creeke on the West com'only called by the Indyans by the name of Nackaquatok and by the English the Cold Spring, to stretch eastward to Nassaquack River; on the North to bee bounded by the Sound running betwixt Long Island and the Maine; and on ye South by ye sea, including there nine several necks of Meadow Ground, all which tract of land together with the s'd necks thereunto belonging, within the bounds, limitts aforesaid, and all or any plantacon thereupon are to belong to the said Towne of Huntington, as also all Havens, Harbors, Creekes," etc.

It is the easterly boundary of this grant which appears to have been so indefinitely fixed as to have caused much trouble, litigation, and this action. The westerly boundary, running a little east of south, seems never to have been disputed, while no one except Mr. Street, the compiler of the Huntington records, seems to have claimed that the easterly boundary ran due south. The plaintiff in this action claims title to the Brookhaven line, or the Ranges, a distance of 4¼ miles easterly from a line drawn due south from the mouth of the Nissequogue river, the easterly point designated in the patent. In no way can this easterly line be drawn so as to bring it to the Ranges, and accord with reason. If, instead of drawing the line due south, it be run parallel with the westerly boundary, it is even then 2¼ miles west of where the plaintiff claims it should be; and if the most easterly bend of the winding Nissequogue river be taken as the starting point, instead of the mouth of that river, the easterly line at the bay is yet one mile west of the Ranges. As none of these lines fit the history or conditions, and as a due southerly line seems never to have been claimed, some other easterly boundary must have been established.

Prior to the patent of 1666, under which the plaintiff claims as aforesaid, a patent or grant had been given to one Richard Smith, which conflicted with the easterly boundary of the Huntington grant on the northerly side of the island. After litigation ending in 1675 Smith established his claim under his patent, which thus moved the easterly boundary of Huntington further to the west. Huntington Records, vol. 2, pp. 140, 141. Thereafter and in 1694 followed a new patent or grant to the town of Huntington, known as the "Fletcher patent," which, after reciting the one of 1666, with its description, read as follows:

"And whereas our loving subjects [reciting them by name] in behalf of themselves and the rest of our loving subjects, the Freeholders and Inhabitants of our said Town of Huntington, have by petition presented unto Benjamin Fletcher, our Captain-General, Governor-in-Chief of our said Province of New York and territories depending thereon in America, prayed our grant and confirmation of the premises, so only as that the limits and bounds of the said Town of Huntington shall not be as above mentioned, but as hereafter expressed—that is to say, all those tracts and necks of land lying upon Long Island, or our Island of Nassau, within our county of Suffolk, being bounded on the west by a river called and known by the name Cold Spring, a line running south from the head of the said Cold Spring to the South Sea, and on the north by the sound that runs between our said Island of Nassau and the main continent, and on the east by a line running from the west side of a pond called and known by the name of Freshpond to the west side of Whitman's Dale or Hollow, and from thence to a river on the south side of our said

Island of Nassau, on the east side of a neck called Sampawams, and from the said river running to the said South Sea."

The easterly line under this patent was thereby fixed at Sampawam's Point, where the defendant in this action claims the present easterly line of the town of Babylon to be. In 1 Johns. Ch. 166, is to be found the record of a case brought in the Court of Chancery, entitled "Nicoll v. The Trustees, etc., of the Town of Huntington," in which the Chancellor has much to say regarding this boundary line as it appeared to him in 1814. While it is true that the point directly in question in that case was the title of the plaintiff, Nicoll, to certain islands in the Great South Bay, in the disputed territory and claimed by Huntington, yet the title of Huntington came in for consideration upon the question of costs, and occasioned the following words from the Chancellor as found in the opinion:

"It cannot be material whether the title set up by the defendants be good or not as to the point of the dismissal of the bill. If they have no title, yet the bill must be dismissed, because the plaintiff has no title, and consequently, no equity to support his case. But it is a very different question whether the bill shall be dismissed with or without costs. * * * In the present case it strikes me that the plaintiff had probable cause to come here. His ancestors had maintained a long and steady claim to the islands in dispute, and had leased one of them as early as the year 1768. He had also succeeded at law in an action of trespass, tried at the Suffolk circuit, in which he had alleged a seisin in himself, and the defendant had alleged a freehold in Huntington, and on the traverse of the defendant's title the issue had been found for the plaintiff. Other trespass suits between the parties were still pending. The issue awarded here was upon the title of the plaintiff; but the defendant's title was brought into view and to the notice of the court by the pleadings, and on the trial of the issue and on the argument in this court the learned judge before whom the cause was tried certified that he gave it as his opinion to the jury that the patents under which the defendants claimed did not cover the islands in dispute. I do not wish to give any decided opinion on that point. When a cause resolves itself into a dry legal question, the proper forum for the determination of it is a court of law, and I only notice that title here incidentally, as it serves to guide me in the exercise of a suitable discretion as to costs. It is admitted that the last patent to Huntington does not touch the islands. If the defendants have a title, it is under this first patent of 1666, and the terms of it are extremely vague as to the southern boundary, and the better opinion is that it is limited in breadth to the 'nine several necks of meadow ground.' If that be so, the premises are excluded. These necks are undoubtedly to be taken in continuity. 'Ad proximum antecedens fiat relatio.' It is a general principle, in the construction of written instruments, that a particular specification will exclude things not specified. But, whatever doubts might have existed under this patent, I consider them as removed by the last patent of 1694, which was granted on the petition of the inhabitants of Huntington, and was intended as a substitute for the preceding patents, 'so that the limits and bounds of their town should not be as above mentioned, but as hereafter expressed.' The clear definition and location of the southern boundaries of their town by this last patent certainly concludes the inhabitants of Huntington from resorting to the vague and indefinite description of the former patents, even if we suppose, in opposition to the usage under our government, that there are technical difficulties in the way of a legal surrender to government of an estate in fee."

It seems to me as though the Chancellor was in a better position a century ago to express an opinion regarding the effect of this patent of 1694 than we are at this day and that there must have been before him facts which warranted him in stating that the boundaries under

the patent of 1666 were so vague and uncertain that by the consent of all parties the last patent of 1694 was granted as a substitute. His conclusion is one which cannot be hastily pushed aside, especially when to do so would exchange certainty for uncertainty.

The plaintiff insists that title once conveyed cannot be lessened by a subsequent conveyance, all of which may be perfectly true if the property conveyed by the first deed can be determined; but where the description in a deed is so vague and uncertain that one of the boundaries cannot be ascertained, and a subsequent deed, accepted and acted upon by the parties, makes that boundary definite and certain, the later deed will determine the property transferred. Kellogg v. Smith, 7 Cush. (Mass.) 381; Commonwealth v. Pejepscut Proprietors, 10 Mass. 155 (see, especially page 162); Reed v. Farr, 35 N. Y. 117.

At no time after this Fletcher patent in 1694 was Huntington or Babylon in undisputed possession of any portion of the Great South Bay between Sampawam's Point and the Brookhaven line. Her claims to the east of the Fletcher patent line were always questioned, and resulted, when fought, in compromises and exchange of quitclaim deeds between the parties in interest. Although the town of Huntington passed numerous resolutions to protect her fishery rights in the Great South Bay, yet only in a few of these does it appear how far her claim of right extended, while, on the other hand, with the exception of one instance, neither Huntington nor Babylon ever took any active measures to exclude the public from the locus in question, permitting and acquiescing for years in the user of the land and waters as though they belonged to the state. Many witnesses have given testimony that, being residents of Islip, they have for many decades fished and clammed unmolested in these waters and upon the land now claimed by Babylon.

As early as chapter 167, p. 368, of the Laws of 1857, the state evidenced its claim to this property by authorizing Islip to make regulations to protect the fisheries; and by chapter 549, p. 739, of the Laws of 1874, amended by chapter 142, p. 150, of the Laws of 1878, known as the "Oyster Laws," the inhabitants of Islip and Babylon were permitted to select and stake off lots in this portion of the bay for the cultivation of oysters. For the purpose of determining what portions of the bay might thus be taken, a board of commissioners was created, consisting of two commissioners from Islip and one from Babylon. Under these laws Babylon selected its commissioner to act with the commissioners from Islip. Numerous leases have been granted and still exist for these oyster lots, and since 1879 Babylon, without protest, has received and accepted income therefrom.

The plaintiff says that this action of the Babylon authorities only pertains to the oyster business and oyster beds, and not to the taking of clams, for which this action was brought; but this acquiescence of Babylon and the parceling out of this property by the state through commissioners from Islip as well as from Babylon, is inconsistent with the claim of exclusive ownership upon the part of Babylon. Likewise since 1850 the state has granted to numerous residents of Islip, by patent, lands under water in the Great South Bay upon which docks have been erected and bulkheads built, and no interference has ever been attempted on the part of Babylon with this continued and exclusive use

under claim of ownership by the grantees. While it may be that such attitude upon the part of Babylon might be merely evidence that its authorities or inhabitants were indifferent to or ignorant of its rights, yet it is a stronger indication to my mind that the town of Huntington and its successor, the town of Babylon, had little confidence in the strength of its claim to title beyond the Fletcher patent line, and reserved its actual possession and its forceful activities as a town to that portion of the territory lying west of Sampawam's Point.

In other words, by permitting the state and the public to treat the land in question as though it were state land for over half a century, if not more, and never making but one attempt to assume possession of any portion, while not sufficient to divest it of a good record title, is strong and conclusive evidence that the easterly boundary of Huntington and Babylon, vague, uncertain, and indefinite under the Nicolls and Dongan patents, had been practically located, agreed to, and acted upon, so as to estop all parties at the Fletcher patent line. The strongest fact in favor of Huntington has been its claim to and user of the islands to the east of Sampawam's Point. But this claim was disputed and litigated, and resulted in a partition of the islands between Islip and Huntington in 1818. But an agreement between Huntington and Islip could not divest the state of its title, and therefore in 1857, chapter 503, p. 46, of the Laws of that year ceded to the town of Islip the title of the state in the lands thus quitclaimed to Islip by Huntington. I cannot, therefore, consider this user of the islands by Huntington sufficient evidence to extend its patent lines. The present action has probably been the only one wherein it has been determined to settle definitely, once and for all, the exact extent of Huntington's territory under its royal grants.

Much stress is laid upon the arbitration of 1833 in the suit of Homan v. Smith; but it is quite evident that the determination of this litigation went no further than to settle the westerly line of Brookhaven, and did not determine whether Huntington or the state owned the land to the west. The pleadings and evidence show that it was claimed upon the part of Brookhaven, through the plaintiffs, that nonresidents of the township were fishing in its waters, while the defendants claimed that the place in question did not belong to Brookhaven. Thus the point in question and determined was the extent and limit of Brookhaven's grant or patent, which was fixed by arbitration at the Ranges. The report of the commission, consisting of three representatives from Brookhaven, three from Islip, and three from Huntington, reads as follows:

"The westerly boundary line of the fisheries of the said town of Brookhaven under the two patents to that town and the patent to Col. William Smith, or by any other title, shall be as follows," etc.

In view of the fact that the answer in this Brookhaven suit set up title either in Huntington or the state of New York, and that the report does not in any way determine which, I do not see how the plaintiff can claim title through this litigation. Furthermore, the state was not a party to that suit.

In view of the above, I conclude as follows:  That the easterly boundary of Huntington and the property granted to it under its patents is fixed and determined by the Fletcher patent of 1694, to wit, at the easterly side of Sampawam's Point; that to the west thereof its title extends to the ocean; that from the easterly side of Sampawam's Point to the Ranges the title to the land under water in the Great South Bay, or the locus in question is in the state of New York; and I accordingly give judgment for the defendant.